Filed 9/8/23  Catwalk to Sidewalk, Inc. v. Hurt-Watson CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CATWALK TO SIDEWALK, INC.,<br><br>Plaintiff, Cross-defendant and Appellant,<br><br>v.<br><br>LANSEL ANN HURT-WATSON,<br><br>Defendant, Cross-complainant and Respondent;<br><br>HEYRI J., INC.,<br><br>Defendant and Respondent. | B304088<br><br>(Los Angeles County Super. Ct. No. BC702335)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING; NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed on August 18, 2023, be modified as follows:

On page 21, line 7 of the first full paragraph, change "4045" to "4405" so the sentence reads:

There was no evidence Hurt-Watson took that database with her when she left the company, and the jury instructions by design did not include the specific instruction, CACI No. 4405, about whether Hurt-Watson improperly "acquired" trade secrets.

There is no change in the judgment.  Appellant's petition for rehearing is denied.

_____
WEINGART, J.         ROTHSCHILD, P. J.        CHANEY, J.

Filed 8/18/23  Catwalk to Sidewalk, Inc. v. Hurt-Watson CA2/1 (unmofied opinion)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CATWALK TO SIDEWALK, INC., | B304088 |
| Plaintiff, Cross-defendant and Appellant, | (Los Angeles County Super. Ct. No. BC702335) |
| v. | |
| LANSEL ANN HURT-WATSON, | |
| Defendant, Cross-complainant and Respondent; | |
| HEYRI J., INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment and postjudgment orders of the Superior Court of Los Angeles County, Stephanie M. Bowick, Judge.  Affirmed in part and remanded in part with directions.

Legacy Pro Law and Gi Nam Lee for Plaintiff, Cross-defendant and Appellant.

Park & Lim, S. Young Lim and Jessie Y. Kim for Defendant, Cross-complainant and Respondent Lansel Ann Hurt-Watson.

Law Offices of Park & Zheng, Stella K. Park and Yalan Zheng for Defendant and Respondent Heyri J., Inc.

———————————————

## INTRODUCTION

Lansel Ann Hurt-Watson worked as a sales representative for a clothing manufacturer called Catwalk to Sidewalk, Inc. (Catwalk). For a time, she simultaneously worked as a sales representative for another clothing manufacturer called Heyri J., Inc. (Heyri J.); she then stopped working for Catwalk while continuing to be a Heyri J. sales representative. Catwalk responded to Hurt-Watson's departure by suing her and Heyri J. for allegedly stealing its trade secrets. Hurt-Watson cross-complained for unpaid commissions she claimed Catwalk owed to her. The jury found no trade secret misappropriation and awarded Hurt-Watson $485,373 on her cross-claim.

On appeal, Catwalk argues we should reverse the judgment because of three alleged errors: a flawed special verdict form, insufficient evidence supporting the damages award to Hurt-Watson, and an improper award of prejudgment interest. We affirm the trial court's orders as to the special verdict form and damages award, and remand with directions to correct the judgment's prejudgment interest award.

2

## FACTUAL AND PROCEDURAL BACKGROUND

**A.    Hurt-Watson Works for Catwalk as a Sales Representative and Helps Sell Catwalk's Pleione Brand to Nordstrom**

We base our factual recitation on the evidence introduced at trial.  Hurt-Watson started working for Catwalk in March 2007.  Hurt-Watson characterized her role at Catwalk as an "independent sales rep[resentative]."  Hurt-Watson testified that in the fashion industry an independent sales representative can work for multiple manufacturers.  During the time she worked for Catwalk, she also worked for Crystal K., Liverpool, and one other manufacturer whose name she could not recall.  According to Catwalk's owner, Kyong Won "Billy" Kang, when Catwalk initially hired Hurt-Watson it gave her a salary and paid her travel expenses, but at some point it began paying her through commissions.

Hurt-Watson knew the buyers for Nordstrom and Nordstrom Rack, and had earlier worked for them at Nordstrom for many years.  Hurt-Watson's value to her client manufacturers was the relationship she had with Nordstrom; she had especially useful information about the "P.O.V." (Point of View) department at Nordstrom (POV), as she had started the department while she worked for Nordstrom.  Knowing the buyers was key to her success as a salesperson.  Kang testified that he hired Hurt-Watson in part because of her connection with Nordstrom.

One of the Catwalk brands Hurt-Watson worked on was "Pleione," which generated many sales for Catwalk.  Catwalk sold the Pleione brand to the Nordstrom POV department.  Catwalk became one of the main manufacturers for Nordstrom after Hurt-Watson began working for Catwalk.

**B.      A New Nordstrom Buyer Demands that Catwalk Lower Its Prices**

In May 2015, Mary Beth Gaffney became the buyer for the Nordstrom POV department.  Hurt-Watson had worked with Gaffney at Nordstrom.  From the time Gaffney became the buyer for the POV department, she complained that Catwalk's prices for the Pleione brand were too high.  Gaffney continued to submit orders for the brand, but Hurt-Watson believed this was because Gaffney did not want to abruptly stop stocking the brand given that some customers went to Nordstrom to buy Pleione.  Hurt-Watson relayed Gaffney's comments to Kang and told him Catwalk needed to lower its prices.  Kang acknowledged that Gaffney wanted Catwalk to lower its prices.

At a meeting on September 12, 2017, Gaffney told Hurt-Watson that Nordstrom's sales of Pleione were down 37 percent year to date, and its receipts from sales of Catwalk products were down 28 percent.  Gaffney demanded that Catwalk pay Nordstrom $432,000 because Nordstrom had not achieved its "guaranteed gross margin" pursuant to Nordstrom's purchasing agreement.  A guaranteed gross margin is the profit margin the retailer expects to achieve; for Nordstrom, the margin was 55 percent.  If a manufacturer's product does not achieve the expected profit margin, then the manufacturer has to pay Nordstrom the difference.

Hurt-Watson met with Kang on September 14, 2017, to discuss Nordstrom's demand that Catwalk pay under the guaranteed gross margin arrangement.  Although Hurt-Watson and Kang dispute certain details of their discussions not relevant to the issues before us, both Hurt-Watson and Kang testified

4

that, as a result of the meeting, Hurt-Watson agreed to lower her commission by 0.5 percent for five months.

The next day, September 15, 2017, Kang sent an e-mail to Gaffney, with a copy to Hurt-Watson, acknowledging that Hurt-Watson had shared with him Catwalk's "[gross margin] performance plus that our cost[s] are higher than our competition."  Kang wrote, "I realize this year has been a challenge and I know we can turn it around and get back on top. I'm going to make it right and will give you the best cost, quick delivery and take fabric liability so we can turn quicker." Catwalk paid Nordstrom "[v]endor [f]unded [m]arkdowns" totaling a little over $428,000.

## C.    Hurt-Watson Starts Working for Heyri J.

Heyri J. is a clothing manufacturer owned by Tiffany Lim. Shortly before the reduction in her sales commission with Catwalk, Hurt-Watson started speaking with Lim in August 2017 about becoming a sales representative for Heyri J.  Hurt-Watson entered an agreement with Heyri J. in September 2017 to become a sales representative for it.  On November 20, 2017, Hurt-Watson reported to Heyri J. that Gaffney, the Nordstrom POV buyer, was interested in selling Heyri J.'s clothes online and then at its stores.

Hurt-Watson continued to represent Catwalk, along with Heyri J.  On December 6, 2017, she met with Gaffney to discuss both Catwalk's and Heyri J.'s styles.  According to Hurt-Watson, she first discussed Catwalk's Pleione brand and then later had a separate discussion about Heyri J.'s products.  Hurt-Watson provided separate notes to Catwalk and Heyri J. about the meeting.  Gaffney placed orders with both Catwalk and Heyri J.

5

## D.     Hurt-Watson Stops Representing Catwalk and the Parties Sue Each Other

On March 2, 2018, Hurt-Watson e-mailed Kang to notify him that she was going to stop working for Catwalk effective March 6, 2018.

Six weeks later, Catwalk filed a complaint against Hurt-Watson, Heyri J., and Lim. Catwalk filed an amended complaint on July 17, 2018, in which it asserted causes of action under the Uniform Trade Secrets Act (UTSA; Civ. Code, § 3426 et seq.) along with various tort causes of action, including breach of the implied covenant of good faith and fair dealing, intentional and negligent interference with contractual relations and prospective economic relationships, and conversion.

Hurt-Watson filed an initial cross-complaint on August 21, 2018, in which she sought only indemnity and declaratory relief from fictitiously named cross-defendants. On September 20, 2018, she filed a first amended cross-complaint seeking unpaid commissions from Catwalk under breach of contract and misrepresentation theories. Hurt-Watson filed a second amended cross-complaint on March 11, 2019, in which she maintained her claim for unpaid commissions and also added new claims not relevant to this appeal.[1]

On October 8, 2019, shortly before trial was set to begin, Catwalk filed a second amended complaint in which it narrowed its claims to assert only causes of action under the UTSA against

---

[1] Those additional claims are not relevant because Hurt-Watson later withdrew them and proceeded with only her claim for unpaid commissions.

Hurt-Watson, Heyri J., and Lim.[2] Catwalk alleged three specific types of trade secrets: (1) "[t]rend [r]eports" from clients, including Nordstrom, which had information regarding the styles the clients were interested in buying for the upcoming season; (2) a "[d]esign [d]atabase," which contained information regarding the clothes Catwalk manufactured; and (3) client information, including the names of retailer contacts, "preferences and desires as to [Catwalk's] products, and financial accommodations." Catwalk alleged that Hurt-Watson "misappropriated . . . [Catwalk's] samples and/or designs to [Heyri J.] in order for [Hurt-Watson and Heyri J.] to develop similar designs and sell them to [Catwalk's] [c]lients for [Hurt-Watson's and Heyri J.'s] benefit."

## E.    Trial

A jury trial began on October 10, 2019, with testimony continuing through October 21, jury instruction and closing arguments on October 22 and 23, and jury deliberations on October 23 and 24.

### 1.    *Catwalk's Claims Under the UTSA*[3]

Catwalk's theory at trial was that Heyri J. hired Hurt-Watson specifically to obtain orders from Nordstrom POV, and

---

[2] Catwalk filed the second amended complaint after the trial court dismissed Catwalk's tort causes of action on the ground that the UTSA preempted them.

[3] During trial, Catwalk dismissed its claim against Lim, Heyri J.'s owner, with the stipulation that her actions "may still be attributed to . . . Heyri J." Our summary of the evidence and the parties' positions thus does not address Catwalk's separate claim asserted against Lim.

that in the process of trying to obtain those orders Hurt-Watson and Heyri J. misappropriated Catwalk's trade secrets. Kang testified that Catwalk's sales to Nordstrom POV declined beginning in 2016 and were a fraction of what Catwalk expected during that time period: in 2015 the sales were $10.7 million, and they decreased to $6.7 million in 2016, to $3 million in 2017, and to $90,000 in 2018; Catwalk had no sales to Nordstrom POV in 2019. Kang attributed this decline in sales to Heyri J. getting orders from Nordstrom POV instead of Catwalk.

Hurt-Watson testified that Catwalk's sales to Nordstrom POV declined for a different reason, namely that Catwalk's prices were too high. Hurt-Watson recounted that, when she met with Gaffney in December 2017, to discuss Catwalk's products, they spent approximately 35 to 45 minutes talking about Gaffney's position that Catwalk's prices were too high. Hurt-Watson named the three reasons that Catwalk's sales to Nordstrom decreased over time as "price, price, [and] price."

Kang testified about Catwalk's design database, known as the "W.I.P." database, which he claimed contained trade secrets regarding Catwalk's products. The database contained designs and patterns for garments Catwalk was producing, along with other information such as the fabric used, vendors who supplied materials, where the garments were fabricated, and the price and number of garments being produced. According to Kang, Hurt-Watson had "full access" to the W.I.P. database until she left Catwalk in March 2018. Kang claimed he did not know, before Hurt-Watson stopped working for Catwalk in March 2018, that she had been working for Heyri J., and if he had known he would have cut off her access to the W.I.P. database.

8

Hurt-Watson acknowledged that while working with Catwalk she had access to the W.I.P. database, which she also referred to as the "Work In Progress" database, and testified that she used the database to access information regarding clothes she had already sold for Catwalk.

Kang claimed that Hurt-Watson had "leaked" Catwalk's designs. He identified four styles which he claimed Heyri J. had copied using information from Catwalk's W.I.P. database. The Heyri J. designer responsible for the four styles testified that she had developed the styles by modifying designs she had created in prior years, and that she based her modifications for three of the styles on images the Nordstrom POV buyer, Gaffney, had posted on the internet through the Pinterest app. Kang agreed that Hurt-Watson had provided the images from Gaffney's Pinterest account to both Catwalk and Heyri J., and that Catwalk came up with the designs it claimed Heyri J. copied based on the Pinterest images.

In addition to the W.I.P. database, Kang testified that Catwalk considered its "client information" to constitute trade secrets. Kang described this "client information" to include the buyer's preferences and "buying style." Kang also included in the concept of "client information" trend reports Catwalk received from Nordstrom. However, Kang and Hurt-Watson both testified that Hurt-Watson was Catwalk's exclusive representative with respect to Nordstrom POV (and Nordstrom Rack), and Kang testified that Catwalk hired Hurt-Watson because of her prior relationship with, and knowledge about, Nordstrom, including the POV department.

9

2.    *Hurt-Watson's Claim for Unpaid Commissions*

Hurt-Watson was paid commissions as a percentage of sales that were delivered or "shipped" to retailers, such as Nordstrom, and she was paid her commission only after the product was delivered. There was a delay, lasting several months, between the time a retailer ordered product and when the product was delivered. Hurt-Watson was paid different commission rates for different retailers, and sometimes there would be adjustments to her commission rates.

a.    Alleged Underpayment of Commissions from 2014 to 2018

Hurt-Watson testified that she had been underpaid for commissions she earned from 2014 to 2018 while she was still representing Catwalk. She testified that she calculated she had earned $3,766,000 in commissions from 2014 to 2018. Hurt-Watson told the jury that she believed she was owed $1,110,000, based on her comparison of the $3,766,000 amount she had earned with the amount of commissions Catwalk had actually paid her during 2014 to 2018. Hurt-Watson also attempted to introduce corroborating testimony and documents from two personal assistants that worked for her. The court excluded the offered exhibits at the request of Catwalk because Hurt-Watson was only entitled to commissions on the amount of product shipped, and the documents at issue recorded the amount of product ordered and not the amount shipped.

b.    Unpaid Commissions from 2018 Onwards

Both parties agreed that Catwalk had not paid Hurt-Watson for commissions on product shipped in February 2018 and the following months. Kang admitted that Hurt-Watson was entitled to $15,639.89 in commissions for February 2018

shipments. On April 2, 2018, Catwalk issued a check to Hurt-Watson in the amount of $15,639.89, but stopped payment on the check. Kang testified that Catwalk stopped payment on the check "because . . . there was still a pending order . . . that was worth . . . $1.7 million . . . that needed to be . . . checked on." Kang also admitted that Catwalk owed Hurt-Watson $62,825.60 in commissions for product shipped in March 2018; he likewise explained the non-payment of that amount based on the $1.7 million order which was still pending.

The $1.7 million issue was apparently related to a request by Nordstrom Rack to cancel part of an order it had made, which resulted in Catwalk producing product that Nordstrom Rack would not accept. Hurt-Watson denied that she owed any money to Catwalk in February or March of 2018, and stated that, as a sales representative, she would not be responsible to pay the manufacturer out of unrelated commission income if a retailer cancels an order.

There was no evidence about the specific amount of commission that Hurt-Watson was entitled to receive for orders shipped in April 2018 or the following months. She testified that she brought in $15 million to $20 million for Catwalk after she started working for Heyri J. and later testified she had not been paid commissions on orders for "like 25, 30 million" in product, and her commissions on those orders would have been paid out through October 2018.

3. *The Special Verdict Form*

A party can be held liable under the UTSA for misappropriating a trade secret by improperly acquiring, disclosing, or using it; there is a separate standard jury instruction for each of "acquisition," "disclosure," and "use."

11

(CACI Nos. 4405 [acquisition], 4406 [disclosure], 4407 [use].)
When the parties discussed jury instructions on October 22, 2019,
Catwalk's counsel agreed that the instruction for "disclosure" of a
trade secret (CACI No. 4406) would only apply to Hurt-Watson,
and not to Heyri J. In addition, all counsel agreed the jury
instruction regarding "acquisition" of a trade secret (CACI
No. 4405) would apply only to Heyri J., and not to Hurt-Watson.
The parties left in jury instructions regarding "use" (CACI
No. 4407) as to both Hurt-Watson and Heyri J.[4]

Counsel for Hurt-Watson prepared a proposed special
verdict form, which the court and counsel discussed on
October 23, 2019.[5] Hurt-Watson's counsel explained that he had
structured the question regarding whether Hurt-Watson had
misappropriated Catwalk's trade secrets (question No. 5) to ask
only if Hurt-Watson had "disclosed" Catwalk's trade secret.
According to counsel, this was based on the parties' agreement

---

[4] Consistent with this agreement, the jury was provided
with separate instructions regarding alleged "disclosure" (CACI
No. 4406) and "use" (CACI No. 4407) of trade secrets by Hurt-
Watson, and alleged "acquisition" (CACI No. 4405) and "use"
(CACI No. 4407) of trade secrets by Heyri J. However, the
parties failed to apply these changes to the more general
introductory instructions (CACI Nos. 4400 and 4401). As a
result, the jury was also instructed Catwalk claimed Hurt-
Watson and Heyri J. had "misappropriated" its trade secrets, and
" 'Misappropriation' means the improper acquisition, use, or
disclosure of the trade secret" (CACI No. 4400); and it was
instructed Catwalk had to prove that Hurt-Watson and Heyri J.
"improperly acquired, used, or disclosed" the alleged trade secrets
(CACI No. 4401).

[5] The proposed form itself is not in the record.

the day before that the jury instructions would only address one type of misappropriation by Hurt-Watson, namely "disclosure" of trade secrets. The proposed form also told the jury to skip questions about Heyri J.'s liability if it did not find Hurt-Watson had improperly disclosed a trade secret.

Hurt-Watson's counsel was partially correct and partially mistaken about the jury instructions: while the instructions did not include the instruction regarding "acquisition" of the trade secrets by Hurt-Watson (CACI No. 4405), they did still include the instruction regarding "use" of the trade secrets by Hurt-Watson (CACI No. 4407). When Hurt-Watson' counsel brought up the issue, both the court and Catwalk's counsel apparently forgot that the parties had agreed to limit the jury instructions on misappropriation. Catwalk's counsel argued that the special verdict form should include "[a]cquire, disclose or use." The parties then agreed to make the change requested by Catwalk's counsel, and the court read the agreed-upon language as follows: "Question 5, 'Did [Hurt-Watson] acquire, use or disclose any of [Catwalk]'s [t]rade [s]ecrets?'" The court asked, "Right?" and all counsel agreed. The court read the agreed-upon language in the parallel question regarding Heyri J. (question No. 9) as follows: "Did [Heyri] J. acquire, use or disclose any of the trade secrets, by improper means?" and Catwalk's counsel agreed it was acceptable.[6] As with the prior version of the form, if the jury did not find Hurt-Watson liable for acquiring, using, or disclosing a Catwalk trade secret, it was not to answer question No. 9 about

---

[6] This was despite the jury instructions only addressing Heyri J.'s "use" and "acquisition" of Catwalk's trade secrets and not any purported "disclosure."

13

Heyri J.'s liability. When the parties finished reviewing the form, the court took over the task of making the edits to the special verdict form document.

After counsel had completed their closing arguments, the court provided counsel with a revised version of the special verdict form.[7] But question No. 5 on the form had not in fact been revised, and still asked, "Did [Hurt-Watson] disclose any of the Catwalk . . . trade secret [*sic*] by improper means?" Nor had question No. 9 on the form been revised, as it still asked, "Did Heyri J. acquire and use any of the trade secrets by improper means?" However, after providing counsel an opportunity to review the form, when the court asked Catwalk's counsel if he was "happy with the final version of the verdict form," counsel responded, "Very happy, your Honor" and did not note any errors or omissions on questions Nos. 5 or 9.

4. *The Jury's Verdict*

The jury returned its verdict on October 24, 2019. The jury found that Catwalk's design database was a trade secret, but the trend reports generated by Nordstrom and Nordstrom's contact information were not. In response to the question, "Did . . . Hurt-Watson disclose any of the Catwalk . . . trade secret [*sic*] by improper means?" the jury answered "No." Following the instructions on the form, the jury did not answer question No. 9, "Did Heyri J. acquire and use any of the trade secrets by improper means?" or any of the following questions about Heyri J.'s alleged liability because the jury answered the question about Hurt-Watson in the negative. The jury found that Catwalk owed Hurt-Watson commissions in the amount of $485,373.

---

[7] This revised form is not in the record either.

14

5.    *The Judgment*

On November 22, 2019, the trial court entered judgment on the jury's verdict, and filed and served a notice of entry of judgment that same day.  Under the judgment, Hurt-Watson was awarded prejudgment interest at a rate of 10 percent "from the date of filing of [Catwalk's initial] [c]omplaint."

**F.    Catwalk's Postjudgment Motions**

Catwalk filed three posttrial and postjudgment motions: a motion to set aside and vacate the judgment under Code of Civil Procedure[8] section 663, a motion for new trial, and a motion for judgment notwithstanding the verdict (JNOV).

In its motion to set aside and vacate the judgment, Catwalk challenged the award of prejudgment interest to Hurt-Watson from the date its complaint was filed, and the award of costs to Heyri J.

In its motion for new trial, Catwalk presented two arguments of relevance to this appeal.  The first claimed the special verdict form was "fatally defective" because it allowed the jury to find Hurt-Watson liable only if she "disclosed" Catwalk's trade secrets, and required the jury to make a finding about Heyri J.'s liability only if it found Hurt-Watson liable for disclosure of a trade secret despite the UTSA's liability provisions for improperly "acquiring" and "using" a trade secret in addition to liability for "disclosing" one.  The other argument claimed that insufficient evidence supported the judgment in Hurt-Watson's favor for unpaid commissions.

---

[8] All unspecified statutory references are to the Code of Civil Procedure.

15

In its JNOV motion, Catwalk sought judgment in its favor on its claims under the UTSA and on Hurt-Watson's claim for unpaid commissions. Catwalk also contended in its JNOV motion that the special verdict was fatally flawed, but it did not explain how the alleged deficiency entitled it to a judgment in its favor against Hurt-Watson or Heyri J. under the UTSA.

The court denied Catwalk's motion to set aside and vacate the judgment on January 14, 2020. It denied Catwalk's motions for new trial and for JNOV on January 23, 2020. We address the court's rulings on Catwalk's motions below to the extent they are pertinent to Catwalk's appellate arguments.

## G. Catwalk Appeals

On February 18, 2020, Catwalk filed a timely notice of appeal of the judgment and the trial court's rulings on Catwalk's posttrial motions.

## DISCUSSION

## A. The Special Verdict Form

The trial court utilized a special verdict form which required the jury to answer factual questions. "[A] special verdict is that by which the jury find the facts only, leaving the judgment to the [c]ourt. The special verdict must present the conclusions of fact as established by the evidence, and not the evidence to prove them; and those conclusions of fact must be so presented as that nothing shall remain to the [c]ourt but to draw from them conclusions of law." (§ 624.)

Catwalk claims the trial court erred in denying its posttrial motions on the UTSA claims, and that we should reverse the judgment, because the special verdict form was "fatally defective" in that it did not require the jury to address all the issues

16

presented by Catwalk's claims.  Catwalk first contends that the verdict form should have asked whether Hurt-Watson "acquire[d]," "use[d]," or "disclose[d]" any of Catwalk's trade secrets, but the form only asked whether Hurt-Watson had "disclose[d]" any trade secrets.  It also contends the form "failed to ask the jury to determine Heyri J.'s liability *at all*" because the jury was instructed to skip questions about Heyri J. if it determined that Hurt-Watson did not disclose any trade secrets.

In the crush of trial, errors can and do happen.  What occurred here with the special verdict form illustrates that reality.  The special verdict form given to the jury did not reflect agreed-upon edits.  Even if those edits had been made, they would have been at odds with the agreed-upon jury instructions given to the jury.  But merely establishing an error occurred is not the end of the inquiry.  Catwalk was entitled not to a perfect trial but to a fair one, because "taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial." (*United States v. Hasting* (1983) 461 U.S. 499, 508 [103 S.Ct. 1974, 76 L.Ed.2d 96].)  It is for such reasons that Article VI, section 13 of the California Constitution provides:  "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."  This constitutional principle applies to errors in a special verdict form.  (*Rodriguez v. Parivar, Inc.* (2022) 83

17

Cal.App.5th 739, 756 ["A court's defective special verdict question requires reversal if the error results in a miscarriage of justice"].)

As explained below, Catwalk forfeited its challenge to the special verdict form by failing to object to any error in the form's language prior to the trial court's discharge of the jury, and in any event the errors here were harmless.

1.     *Catwalk Forfeited Its Challenge*

All counsel approved the special verdict form actually used by the jury before it was submitted to the jury.  It is also undisputed that neither Catwalk nor anyone else raised any concern about the special verdict form while the jury was deliberating, when the form was read aloud after the jury reached its verdict, when the jury was polled about its verdict, or at any other point before the jury was discharged.  In those circumstances, Catwalk cannot now claim error.

In *Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, the special verdict form erroneously instructed the jury to skip some questions relating to the defendant's liability.  (*Id.* at p. 1241.)  Our colleagues in Division Six concluded the trial court did not err in denying the defendant's JNOV motion on the ground the defense counsel had not objected to the defect before the jury was discharged, stating, " ' "*Failure to object to a verdict before the discharge of a jury and to request clarification or further deliberation precludes a party from later questioning the validity of that verdict if the alleged defect was apparent at the time the verdict was rendered and could have been corrected.*"  [Citation.]' " (*Id.* at p. 1242, quoting *Keener v. Jeld–Wen, Inc.* (2009) 46 Cal.4th 247, 263-264.)  "Because [the defendant] did not object and had expressly approved the erroneous verdict form, it forfeited its claim that the special

18

verdict is defective because the jury did not answer [some] questions [relating to liability]." (*Id*. at pp. 1242-1243; see also *Jenson v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 131 [affirming denial of motion for new trial because the defendant had "waived any objection to the special verdict form by failing to object before the court discharged the jury"].)

Catwalk relies on a statement in *Saxena v. Goffney* (2008) 159 Cal.App.4th 316 that "courts have declined to apply the waiver rule 'where the record indicates that the failure to object was not the result of a desire to reap a "technical advantage" or engage in a "litigious strategy." ' [Citations.]" (*Id*. at pp. 327-328.) The facts here, however, are distinguishable from that case. In *Saxena*, the plaintiffs submitted a special verdict form that did not require the jury to find a fact legally necessary to the award of certain damages. (*Id*. at pp. 324-326.) The appellate court found the defendant did not waive his objection to the special verdict form for purposes of appeal where he did object before the trial court that the special verdict form was erroneous, "[i]t was [the] plaintiffs' responsibility to tender their case to the jury," and the defendant was not required to renew his objection because "[i]f [the] plaintiffs chose to submit a verdict form tendering less than their full case to the jury, [the defendant] had no further incentive to object." (*Id*. at p. 328.) Here, of course, Catwalk was the plaintiff on the UTSA claims at issue, bore the responsibility to tender its claims to the jury, and did not object to the special verdict form until after the jury was discharged.

Catwalk had two clear opportunities to object. The first was when the court circulated the special verdict form before it was presented to the jury. Catwalk argues without any record support that its counsel was given only "moments" to review the

19

form before it was to be presented to the jury.  What the record in fact shows is that Catwalk's counsel had sufficient time to notice certain corrections that needed to be made and notified the court about them.  Moreover, counsel did not inform the court he did not have enough time to review the form, nor did he request additional time.  Instead, when the court asked counsel if he was "happy with the final version of the verdict form," counsel responded, "Very happy, your Honor."  While it does appear that the final form did not conform with what the parties had agreed to earlier that day, we would expect counsel to review those portions of the form the parties had discussed to verify that agreed-upon corrections were made and to notice that they had not.

The second clear opportunity for Catwalk to object was when the jury's verdict was announced in court.  The clerk read the special verdict aloud (such that any missing verbiage would have been apparent) and, after the jury was polled on each question it answered, the court asked Catwalk's counsel, "anything further that you're requesting with the jury present," to which he responded, "Nothing."  The jury was then discharged.  Under these circumstances, the failure to object before the jury was discharged forfeits Catwalk's appellate challenge to the special verdict form.

2.    *There Was No Miscarriage of Justice Requiring Reversal*

Even if the claim of error was not forfeited, any deficiencies in the special verdict form were harmless.  "[A] defective special verdict form is subject to harmless error analysis." (*Taylor v. Nabors Drilling USA, LP*, *supra*, 222 Cal.App.4th at p. 1233.)  We review for a miscarriage of justice, which "has occurred if, upon

20

our examination of the entire cause, including the evidence, we conclude ' "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' [Citation.]" (*Rodriguez v. Parivar*, *supra*, 83 Cal.App.5th at pp. 756-757.)  The Supreme Court has " 'made clear that a "probability" in this context does not mean more likely than not, but merely a *reasonable chance,* more than an *abstract possibility*.' [Citation.]" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.)[9]

The jury found that the only trade secret Catwalk had established was its W.I.P. database.  Hurt-Watson indisputably had access to the database while at Catwalk and was familiar with facts in it from her work as a sales representative.  There was no evidence Hurt-Watson took that database with her when she left the company, and the jury instructions by design did not include the specific instruction, CACI No. 4045, about whether Hurt-Watson improperly "acquired" trade secrets.  The omission of the "acquired" prong from the special verdict form as to Hurt-Watson was therefore not only harmless but appropriate given the parties' agreement not to give a jury instruction on that issue as to Hurt-Watson.

We further conclude that, given the jury's unanimous finding that Hurt-Watson did not "disclose" the trade secrets in the W.I.P. database, there was no reasonable chance it would

---

[9] We reject Catwalk's assertion that de novo review applies. The de novo standard applies to review of potentially ambiguous or inconsistent verdicts (e.g., *Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1091-1092; *City of San Diego v. D.R. Horton San Diego Holding Co., Inc*. (2005) 126 Cal.App.4th 668, 678) and not to errors in the form itself.

have found that Hurt-Watson "use[d]" those trade secrets. Catwalk's theory of misappropriation was that Hurt-Watson disclosed Catwalk's designs to Heyri J., which copied the designs to produce its own garments. In particular, Catwalk's case rested on its claim that Heyri J. had copied four specific styles using information from the W.I.P. database. Given that any such "use" could have come only after the alleged "disclosure" to Heyri J. of information from Hurt-Watson, we perceive no reasonable chance the jury would have found "use" when it found no "disclosure" of that information to Heyri J. in the first place. Furthermore, Catwalk did not claim that Hurt-Watson had improperly "used" information from the W.I.P. database other than to disclose it to Heyri J., nor was there any evidence adduced to support such a claim.

Similarly, given the jury's finding that Hurt-Watson had not disclosed the trade secrets in the W.I.P. database, there was no reasonable chance the jury would have found that Heyri J. acquired, disclosed, or used those trade secrets. There was no evidence adduced at trial showing that Heyri J. could have known about information from the W.I.P. database (which it would have needed to do to acquire, disclose, or use that information) other than by obtaining it from Hurt-Watson. The errors in the special verdict form were therefore harmless.[10]

_____

[10] Because we find any errors with the special verdict form harmless, we need not address Catwalk's argument that the trial court improperly concluded Catwalk failed to support its new trial motion related to the special verdict form with affidavits under section 658.

**B.      Hurt-Watson's Claim for Unpaid Commissions**

Catwalk next contends that the trial court erred in denying its motions for new trial and for JNOV as to Hurt-Watson's claim for unpaid commissions.

### 1.      *Standard of Review*

"A trial court may grant a motion for [JNOV] only if the evidence, viewed most favorably to the prevailing party, is insufficient to support the verdict." (*Markow v. Rosner* (2016) 3 Cal.App.5th 1027, 1044-1045.)  " 'On appeal from the denial of a JNOV motion, an appellate court must review the record de novo and make an independent determination whether there is any substantial evidence to support the jury's findings.  [Citations.]' [Citation.]" (*Minnegren v. Nozar* (2016) 4 Cal.App.5th 500, 514, fn. 7.)  "The denial of a new trial motion is reviewed for an abuse of discretion, except that a trial court's factual determinations are reviewed under the substantial evidence test." (*Ibid.*)[11]

---

[11] Hurt-Watson contends that we should affirm the trial court's rulings on the motions for JNOV and a new trial on the ground Catwalk failed to submit evidence to the trial in support of its motions.  Catwalk did not submit any trial transcripts or copies of exhibits in support of its motions, and the trial court denied the motions on that ground, among others.  However, given that our review of the denial of the JNOV motion is de novo and we must make an independent determination on the substantial evidence question (*Minnegren v. Nozar, supra*, 4 Cal.App.5th at p. 514, fn. 7), the alleged inadequacy in the separate new trial motion on the same issue does not thwart our obligation to address Catwalk's sufficiency arguments based on the record on appeal, including the trial transcript and the trial exhibits.

"In reviewing the sufficiency of evidence to support the jury's finding, we review the record in the light most favorable to the prevailing party, resolving in favor of the prevailing party all conflicts in either the evidence or the reasonable inferences to be drawn therefrom, to determine whether the record contains substantial evidence, contradicted or uncontradicted, supporting the finding. [Citations.] ' "Substantial evidence" is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value.' [Citation.] 'The focus is on the quality, rather than the quantity, of the evidence.' [Citation.] 'Inferences may constitute substantial evidence, but they must be the product of logic and reason. Speculation or conjecture alone is not substantial evidence.' [Citation.] 'The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record.' [Citation.] The testimony of a single witness may be sufficient. [Citation.]" (*Markow v. Rosner*, *supra*, 3 Cal.App.5th at p. 1045.)

2. *Sufficient Evidence Supported the Jury's Award to Hurt-Watson*

In arguing the evidence it owed commissions was insufficient, Catwalk focuses on an alleged lack of documentary evidence but ignores Hurt-Watson's testimony at trial. She testified that Catwalk owed her $1,110,000 in commissions she had earned from 2014 to 2018 and explained how she calculated that amount. That testimony provided substantial evidence to support the jury's award of less than half of that amount to her as damages. Hurt-Watson's testimony was based in part on a Catwalk sales report admitted into evidence, and for sufficiency of the evidence purposes her testimony was reasonable, credible and of solid value.

24

Catwalk argues there was no competent evidence that this sales report reflected shipped goods, as opposed to merely ordered goods. However, Kang agreed in his testimony that the report at issue "reflects sales of Catwalk . . . to . . . all of its vendors." Kang had earlier testified that Catwalk completes a sale "[w]hen the goods are . . . shipped out completely." Furthermore, the jury could reasonably infer that Hurt-Watson, who worked as a sales representative for Catwalk for over a decade, could interpret Catwalk's sales report.

Catwalk also argues that there was no evidence the report "included chargebacks, or excluded orders on which Hurt-Watson was not entitled to a commission pursuant to her agreements with [Catwalk]." However, the jury could reasonably infer that Hurt-Watson was aware of any instances where she was not entitled to a commission on specific orders and had factored that into her calculation. In any event, the jury's award suggests that the jury discounted the amount claimed by Hurt-Watson to account for potential chargebacks, excluded orders, and other factors that reduced the amount owed.

In addition, the evidence showed that Catwalk did not pay Hurt-Watson for commissions she earned based on goods that were shipped in February 2018 and the following months. In fact, Kang agreed that Catwalk had not paid Hurt-Watson any commissions since January 2018. Kang admitted that Hurt-Watson was entitled to $15,639.89 in commissions for February 2018 shipments. On April 2, 2018, Catwalk issued a check to Hurt-Watson in the amount of $15,639.89, but stopped payment on the check. Kang also admitted that Catwalk owed Hurt-Watson $62,825.60 in commissions for March 2018 that it had not paid. Kang attempted to explain that Catwalk had held up these

25

two payments due to a "pending order," but Catwalk presented no evidence to support this claim nor any explanation how the purported "pending order" issue would impact Hurt-Watson's commissions earned on other sales. Furthermore, Hurt-Watson denied that this purported issue would impact her commission, which provided substantial evidence for the jury to reject Catwalk's explanations for its failure to pay.

" 'Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty. [Citations.] The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation. [Citation.]' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 774.) The jury's award to Hurt-Watson satisfies this principle. We accordingly reject Catwalk's claim that substantial evidence does not support the jury's award of unpaid commissions to Hurt-Watson.

## C.    **Hurt-Watson's Claim for Prejudgment Interest**

Catwalk's final claim is that the trial court erred in awarding Hurt-Watson prejudgment interest from the time Catwalk filed its lawsuit. Catwalk contends that Civil Code section 3287, subdivision (b) (section 3287(b)) limited the court to starting the accrual of prejudgment interest no earlier than the time Hurt-Watson filed her first amended cross-complaint, which was the first time she asserted a claim for unpaid commissions. We agree with Catwalk that the trial court was limited under section 3287(b) to starting prejudgment interest from the date Hurt-Watson filed her first amended cross-complaint, but for slightly different reasons than those advanced by Catwalk.

26

"We review the trial court's ruling on prejudgment interest under section 3287(b) for abuse of discretion. [Citation.] We will uphold the trial court's exercise of discretion 'if it is based on a "reasoned judgment" and complies with the ". . . legal principles and policies appropriate to the particular matter at issue." ' [Citation.]" (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 574.) We review questions of law regarding the interpretation of section 3287(b) de novo. (*Airs Aromatics, LLC v. CBL Data Recovery Technologies, Inc.* (2020) 50 Cal.App.5th 1009, 1013.)

Section 3287(b) provides: "Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed."[12] "The rationale for precluding prejudgment interest on unliquidated claims is 'that it is unreasonable to expect a defendant to pay a debt before he or she becomes aware of it or is able to compute its amount.' [Citation.] By allowing the trial court to consider awarding prejudgment interest on an unliquidated contractual claim within the limits prescribed by the statute, section 3287(b) aims

_____

[12] Civil Code section 3287, subdivision (a) governs the award of prejudgment interest where the damages are "certain, or capable of being made certain by calculation." Hurt-Watson contends that the trial court's award of prejudgment here was proper under this provision. However, the trial court did not rely on this provision, and Hurt-Watson has forfeited this argument as she conceded the inapplicability of Civil Code section 3287, subdivision (a) in the trial court.

27

'to balance the concern for fairness to the debtor against the concern for full compensation to the wronged party.' [Citation.]" (*Hewlett-Packard Co. v. Oracle Corp.*, *supra*, 65 Cal.App.5th at p. 576.)

The statutory language that the start date for prejudgment interest can "in no event [be] earlier than the date the action was filed" (§ 3287(b)) is ambiguous. One can read it as the trial court did, to refer to the initial pleading in the lawsuit regardless of who filed it. Or one can read it, in the case where the breach of contract claim is asserted via cross-complaint, to refer to the date the cross-complaint was filed. Because the statutory language permits more than one reasonable interpretation, we consider other aids, such as the statute's purpose, legislative history, and public policy. (*Segal v. ASICS America Corp.* (2022) 12 Cal.5th 651, 662.) We also consider the context of the entire statute and the statutory scheme of which it is a part to give significance to every part of them. (*Ibid.*)

The legislative history is silent on the definition of "action." The parties instead point to different definitions of "action" in the Code of Civil Procedure as supporting their respective interpretations of the term. Hurt-Watson relies on section 411.10, which provides: "A civil action is commenced by filing a complaint with the court." Although Hurt-Watson does not make her argument explicit, the inference is presumably that the filing of a cross-complaint cannot commence an "action," only a complaint.[13] Catwalk relies on section 583.110, subdivision (a),

---

[13] We note for the sake of completeness that Hurt-Watson agreed to prejudgment interest running from the date of her first amended cross-complaint in the trial court before the trial court

28

which defines "action," for purposes of the chapter in which it is located (which governs dismissal for delay in prosecution), to "include[ ] an action commenced by [a] cross-complaint." Catwalk also notes our Supreme Court has recognized in other contexts that "action" can sometimes refer to proceedings on a cross-complaint. (E.g., *Shepard & Morgan v. Lee & Daniel, Inc.* (1982) 31 Cal.3d 256, 260 ["In prior cases, albeit in other contexts, we have deemed that a complaint and cross-complaint are *separate* actions"].)

There is an additional definition of "action" in section 22 which seems to us more informative. Section 22 provides: "An action is an ordinary proceeding in a court of justice by which one party prosecutes another for the declaration, enforcement, or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense." This definition suggests that "action" encompasses the claims of one party against another, which would suggest that prejudgment interest on Hurt-Watson's contract claim cannot go all the way back to Catwalk's complaint, as that complaint did not assert Catwalk had wronged Hurt-Watson, but the exact opposite.

Considering these interpretive aids and the statutory purpose, we conclude the phrase "the date the action was filed" in section 3287(b) refers to the filing of the cross-complaint where the cause of action against a cross-defendant which is the basis for the prejudgment interest award is asserted by cross-complaint. This balances the two fundamental concerns at issue in section 3287(b)—that the wronged party receive full

---

rejected her concession. That, of course, does not preclude her from defending the prejudgment interest award on appeal.

compensation and " 'that it is unreasonable to expect a defendant to pay a debt before [it] becomes aware of it or is able to compute its amount.' " (*Hewlett-Packard Co. v. Oracle Corp.*, *supra*, 65 Cal.App.5th at p. 576.)  While it is logical to assume that, by being sued, a defendant has become aware of a debt owed to the plaintiff, that logic does not justify an inference that a plaintiff, by suing a defendant, is aware of any unliquidated debt the defendant might claim the plaintiff owes or is able to compute its amount.

Catwalk attempts to take the interpretation of "action" in section 3287(b) a step further.  It contends the filing of the "action" for purposes of section 3287(b) is not when Hurt-Watson first cross-claimed but when she filed her first amended cross-complaint, because it was in that pleading that she first asserted her purported right to contractual damages.  We need not address the interesting interpretive question of whether the initial complaint or cross-complaint must allude to the breach of contract claim for purposes of section 3287(b)'s definition of "action."  That is because Hurt-Watson's initial cross-complaint was not asserted against Catwalk at all.  To the contrary, the initial cross-complaint sought only indemnity and declaratory relief from fictitiously named cross-defendants.  Catwalk was first named as a cross-defendant in Hurt-Watson's first amended cross-complaint and was not a party to the cross-complaint before that time.[14]  It was the filing of the first amended cross-

_____

[14] In amending the cross-complaint, Hurt-Watson added Catwalk as a cross-defendant and did not substitute Catwalk for one of the fictitiously named parties.

30

complaint which therefore initiated Hurt-Watson's "action" against Catwalk, and that governs under the facts here.

In conclusion, under the specific facts of this case, section 3287(b) limited the trial court to starting the accrual of prejudgment interest at the earliest from when Hurt-Watson filed her first amended cross-complaint on September 20, 2018. Accordingly, we vacate that portion of the judgment awarding prejudgment interest "from the date of filing of the Complaint" and remand for the trial court to correct the judgment to award prejudgment interest "from the date of filing of the First Amended Cross-Complaint . . . ."

## DISPOSITION

The judgment is remanded with directions to strike that portion of the judgment stating prejudgment interest is awarded "from the date of filing of the Complaint" and replace it with "from the date of filing of the First Amended Cross-Complaint . . . ." The judgment and the postjudgment orders are otherwise affirmed. Hurt-Watson and Heyri J. are awarded their costs on appeal.

NOT TO BE PUBLISHED


                                        WEINGART, J.


We concur:



        ROTHSCHILD, P. J.          CHANEY, J.




31